IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**BOMBARDIER CAPITAL INC.**                                                          **PLAINTIFF**

vs.                                                              CIVIL ACTION NO. 1:04cv884-RHW

**ROYER HOMES OF MISSISSIPPI, INC.,
LARRYE JOE WHITE and
PATRICIA B. WHITE**                                                              **DEFENDANTS**

### MEMORANDUM OPINION

This case came before the Court for final hearing on Plaintiff's replevin, beginning on March 16-17, 2005, and concluding March 22, 2005. The Court having heard all the evidence and arguments of counsel, finds as follows:

### Jurisdiction

Plaintiff, Bombardier Capital Inc. [Bombardier], is a Massachusetts corporation with its principal place of business in Colchester, Vermont. Defendant Royer Homes of Mississippi, Inc. [Royer] is a Mississippi corporation with its principal place of business in Gulfport, Mississippi. This Court has personal jurisdiction over the parties, subject matter jurisdiction pursuant to 28 U.S.C. § 1332, and venue is proper under 28 U.S.C. § 1391(a)(2).

### Findings of Fact

Founded in 1985, Royer is a retail seller of manufactured homes. Since its inception, Royer has had as many as seven sales locations at one time. As of the date of the issuance of the Writ of Replevin in December 2004, it had only two – one in Brookhaven, MS and the other in Slidell, LA. Royer President, Larrye White, testified the manufactured home market dropped 75% in four years; that Royer's business had gone from doing $20,000,000 a year to $1,000,000

a year.  The business had gone from having nine people in the corporate office to only one, White's wife, Patsy, the Secretary/Treasurer of Royer. [Tr., vol. 2, p. 64]  Patsy White testified the worst decline in manufactured home sales began in 1998; that Royer had begun trying to decrease inventory, and had closed sales centers and reduced personnel.  She also testified that since 1998, she and her husband had personally put about $2,000,000 into the company. [3/22/05 Tr., p. 7-8]  Although Larrye White denied telling Bombardier he was planning to liquidate or shut down his business [Tr., vol. 2, p. 22, 42], he also testified he was trying to sell both the Brookhaven and Slidell sales centers and that, at the time the replevin was issued, Royer was having a "going out of business sale" at the Slidell center. [Tr., vol. 2, p. 21, 23]

      Bombardier provides wholesale financing for dealerships of various products throughout the country.  For over ten years, Bombardier provided inventory floor plan financing for Royer's mobile home distributorship, pursuant to a written <u>Inventory Security Agreement and Power of Attorney</u> [ISA], effective October 14, 1993 and May 14, 1999 [Ex. P-2], and a Manufactured Housing Addendum also effective May 14, 1999. [Ex. P-3] Royer granted Bombardier a purchase money security interest in all inventory financed by the latter, and Bombardier duly perfected its security interest by filing UCC Financing Statements in the appropriate filing offices.  The UCC Financing Statements, along with the ISA and  Manufactured Housing Addendum, are collectively referred to as the Loan Documents. [Ex. P-4]  All Bombardier-financed inventory, including proceeds from sales thereof and other rights appurtenant thereto constitute Bombardier's collateral.  Larrye and Patsy White also issued personal guaranties unconditionally guaranteeing Royer's payment and performance of its obligations to Bombardier under the Loan Documents, including payment of interest, costs, expenses and reasonable

attorneys' fees incurred by Bombardier in connection with enforcement of the Loan Documents or the Guaranties. [Ex. P-5]

Among other things, Royer was obligated under the Loan Documents to: keep all collateral in good order, repair and operating condition [Ex. P-2, ¶ 5.h]; keep the collateral at its place(s) of business and, during Royer's business hours, to permit inspection of the collateral as well as of Royer's books and records [Ex. P-2, ¶ 5.i]; furnish Bombardier, upon demand, all such information regarding Royer's business and financial condition as Bombardier may reasonably request [Ex. P-2, ¶ 5.j]; and hold in trust for Bombardier the funds and proceeds payable to Bombardier, separate and apart from Royer's funds, and to pay over such proceeds in accordance with the applicable payment plan. [Ex. P-2, ¶ 5.e]  The ISA also provides that dissolution or proceedings to dissolve Royer would constitute a default. [Ex. P-2, ¶ 7.c]  Bombardier representative Susan McFaul testified that Bombardier understood Royer had been administratively dissolved by the State of Mississippi. [Tr., vol. 1, p. 75] Bombardier offered nothing to refute that testimony.   The ISA also states it is a default under the agreement if Bombardier, "in good faith deems itself insecure." [Ex. P-2, ¶ 7.e]  McFaul also testified that credit checks from credit reporting agencies indicated a decline in Royer's credit scores. [Tr., vol. 1, p. 77]  Larrye White testified he was sure his credit score had dropped, though he stated his personal financial condition was in good shape. [Tr., vol. 2, p. 71]

In the spring of 2004, the relationship between Bombardier and Royer became strained. Monthly billing statements and copies of Royer checks [Ex. D-25] indicate that from August 2003 until March 2004, Royer was paying the total current charges due reflected on each statement, but beginning in April 2004, Royer began remitting payment only for insurance and

finance charges shown on the statements.  These statements do not show that Royer ever paid anything on past due curtailments.  Royer witness John Phillips and Susan McFaul testified that a curtailment is an equity or principal payment on a manufactured home floor planned for a dealer, a reduction of the principal to keep it in line with the age and current value of the unit. [Tr., vol. 2, p. 11; vol. 1, p. 59-60]  Royer failed to timely pay, or pay at all, the monthly interest and other charges, including late fees, as invoiced on the monthly statements. [Ex. P-6, P-13, and Tr., vol. 1, p. 63]

By letter faxed to Royer June 14, 2004, Bombardier requested Royer's 7/31/03 fiscal year end balance sheet and income statement and Larrye and Patsy White's personal financial statements, among other things.[1]  [Ex. P-8]   Royer had promised to provide Bombardier this information by May 15, 2004.  Bombardier subsequently agreed to give Royer until July 10, 2004 to provide the information, but stated if all the information were not received by then, Bombardier would not approve further inventory orders. [P-8, p. 1-4]  Royer failed to provide the requested information.[2]

In August 2004, Royer sold a unit of collateral (0089, a Deer Valley home) to a customer named Bliss, and ignored Bombardier's repeated requests for payment.   [ *See* Exhibit P-8(6) - (11) and (17) - (18); Record, Vol. I, at pp. 63, 74-75; Vol. II, at pp. 41, 61-62, 65; Vol. III, at p. 101; Exhibits D-11 and D-12.]   Larrye White testified Bliss was not satisfied, and as long as Royer did not pay Bombardier, the latter could still require Deer Valley to repurchase this unit,

---

[1] Bombardier also requested the annual review questionnaire and copies of statements to verify liquid assets of $100,000 or more. [Ex. P-8]

[2] The Whites did not provide their personal financial statement until the trial of this matter, and there is no evidence that the remaining information has been produced.

4

but if Royer paid Bombardier, then Royer would have no leverage to make Deer Valley get the unit "right." [Tr., vol 2, p. 40-41]  Royer tendered into Court the amount owed Bombardier for the Bliss unit on February 25, 2005, when it attempted to redeem the collateral.  [Tr., vol. 3, p. 101].

By certified mail dated August 27, 2004, Bombardier charged Royer with defaulting on its obligations under the ISA, and specifically demanded immediate payment of some $52,756.34 due Bombardier for sales of collateral (two manufactured homes, serial numbers 0171 and 4070) and other accrued charges which had been billed.  This letter expressly warned Royer that "any further breach or failure by [Royer]" under the ISA might lead Bombardier to enforce its rights and remedies under the ISA and Personal Guaranty *including repossession of inventory*.  [Ex. P-8, p.5]  Royer immediately wrote Bombardier a check for collateral unit 4070, and Royer's monthly billing statement for September 2004 indicates collateral unit 0171 was paid and applied September 17, 2004.   Patsy White testified that Bombardier removed the $8,308.34 accrued charges in September 2004. [3/22/05 Tr., p. 12-13]

On September 29, 2004, Bombardier representatives traveled to Gulfport, MS to meet with Larrye and Patsy White to discuss matters.  [Ex. P-8, p. 17-18]  From the evidence, it is obvious that this meeting failed to remedy the problem between the lender and Royer.  By letter faxed to Royer October 6, 2004, Bombardier demanded payment of $246,717.22, representing amounts due Bombardier for seven collateral units sold by Royer, which had been funded and/or occupied. [Ex. P-8, p. 6-7]  In follow-up correspondence dated October 12, 2004, Bombardier acknowledged receipt of payment for one of the listed units, again demanded payment for the remainder, and terminated Royer's line of credit "effective immediately." [Ex. P-8, p. 9]  On

November 1, 2004, Bombardier demanded immediate payment of $159,667.12, via wire transfer or certified check, for billed and accrued charges and four homes sold by Royer, three of which had been listed in the October 6, 2004 demand for payment. [Ex. P-8, p. 10]  By overnight mail dated November 2, 2004, Bombardier accelerated the account and demanded that Royer and/or the Whites pay the full $1,001,867.30 owed Bombardier  ($970,994.22 for unpaid proceeds of sales of inventory and $30,873.09 accrued charges). [Ex. P-8, p. 12, 15, 16]

     Bombardier field service representative Scott Leonard conducted field audits, checked inventory and made condition reports on the Bombardier collateral.  He found collateral units had been sold, but Bombardier not paid; units had been damaged and left unrepaired; appliances were missing from many units; and some units were "in the field" (off Royer premises) for over six months prior to closing.  One home for which Bombardier had received no payment had been in the field in Louisiana almost a year.  Of fifteen units Leonard examined, he reported only four in good condition with no missing appliances [Ex. P-1 g, i, n, and o], one in good condition but with a broken storm door glass [Ex. P-1 h], eight with missing appliances [Ex. P-1 a, b, e, f, j, k, l, and m],[3] and seven units with miscellaneous damages including missing siding, damaged roof, broken door frame, torn screen door, broken cabinet door, broken window, interior water damage and buckled sheetrock. [Ex. P-1 a, b, c, d, e, j, and l]

     Susan McFaul, Director of Recovery at Bombardier since 1990, manages accounts that have defaulted.  She received the Royer account in November 2004 because of problems with collateral sold for which Bombardier had not been paid, and past due interest owed by Royer.

---

[3] Defense witnesses testified that if they sold a unit which was missing appliances, they would replace the missing appliances out of Royer funds upon sale of the home.  In other words, Royer did nothing to restore the value of Bombardier's collateral unit until it was sold.

[Tr., vol. 1, p. 53]   Ms. McFaul identified the financial programs [P-7, a-d] under which units are purchased, and which designate or describe the interest and other fees, including curtailments, owned by the dealer. [Tr., vol. 1, p. 59]

When Royer and the Whites failed to cure the defaults or satisfy the accelerated amounts due, Bombardier filed its replevin action, posting bond, as required by Miss. Code Ann. § 11-37-105, in the amount of $1,700,000.  The Court issued a Writ of Replevin which was served upon Royer with the complaint, and which effected sequestration of the collateral and prohibited its removal or sale.  Accompanied by U.S. Marshals, Bombardier tagged, or placed signs on, collateral units to give notice that the collateral was subject to seizure and was not to be sold or moved. [Tr., vol. 1, p. 19-20]   The signs on units located in McComb and Brookhaven were at least twice removed requiring replacement by Bombardier, collateral units continued to be sold[4] or occupied,[5]  and at one point, Tim White[6] refused to allow Scott Leonard to come on the lot to check Bombardier collateral units located in McComb, MS [Tr., vol. 1, p. 28-29], though he later allowed Leonard to walk the lot, but told him not to replace the Bombardier tags which had been removed. [Id.]  After the Writ of Replevin was served, Royer left the collateral at its Slidell, LA sales center unattended, and the following day or the next week, according to Larrye White, four of the units there were burglarized.   [Tr., vol. 2, p. 23-24; see also, Tr., vol. 1, p. 27-28]

---

[4]On January 25, 2005, Bombardier received payment on a collateral unit which had been sold contrary to the Writ of Replevin and without Bombardier's consent. [Tr., vol. 1, p. 154, 163]  On or about February 2, 2005, Royer sold two additional collateral units in disregard of the Writ, and remitted payment to Bombardier. [See, Ex. P-20].

[5]In late February or early March, 2005, Bombardier learned that two units for which it had not been paid were being occupied. [Tr., vol. 1, p. 29, 74-75, 80, 65-66]

[6]Tim White, the son of Larrye and Patsy White, sells manufactured homes through the  corporate entity of Royer Estates.  [Tr., vol. 2, p. 47].

The replevin was scheduled for final hearing February 10, 2005, but was cancelled when Royer purported to invoke its right to redeem the collateral under Miss. Code Ann. § 75-9-623. On February 10, 2005, Bombardier presented Royer its itemization of monetary and non-monetary defaults which required curing to redeem the collateral at that time.  Royer disputed the amount of the monetary defaults and tendered into Court $83,439.28, which it contended cured all monetary defaults, and took the position that it had no obligation to cure any non-monetary defaults.

## Conclusions of Law

The court finds from the evidence that the Loan Documents and the Guaranties are valid and enforceable, and that Bombardier properly perfected its liens and security interests in the collateral.  It is undisputed that Bombardier's collateral is the inventory floor planned for Royer pursuant to the Loan Documents.  All of the Collateral is in Royer's constructive possession, custody or control, subject to the rights of Bombardier.   Until Royer's rights are divested by foreclosure, it remains responsible for reasonable expenses incurred to preserve and maintain the collateral, and it remains responsible for risk of loss.   See, Miss. Code Ann. § 75-9-207.

The evidence establishes that before and after the filing of the complaint, Royer defaulted on its obligations under the terms of the Loan Documents.  Royer's breaches include:  failing to provide Bombardier requested financial information;  failing to pay interest and other charges as and when due; failing to properly maintain, protect and preserve the collateral; allowing units to be occupied prior to closing; and failing to promptly remit to Bombardier proceeds from the sales of collateral upon closing or occupancy of the collateral by the buyer.   The facts set forth above, gave Bombardier ample reason to, in good faith, deem itself insecure, and accelerate this account.

At the conclusion of the hearing on March 22, 2005, Royer owed Bombardier $657,002.60 in aggregate principal for financed collateral, including $82,768.41 owed for collateral which has been sold or has become occupied (the out-of-trust amount); $65,232.02 in unpaid interest, insurance and late charges through March 16, 2005 [Ex. P-9(1) through P-9(6), P-7(a) through (d), and Tr., vol 1, p. 59-60];[7] $40,668.05 in attorneys' fees and expenses through March 14, 2005 [Ex. P-11 a through P-11 d], which the Court hereby finds from the evidence to be reasonable; and $3,718.75 costs for the replevin bond through March 16, 2005 [representing 3.5 months, December 2004 through mid-March 2005 of the annual $12,750 premium], for a total of $766,621.42.

Under Miss. Code Ann. § 75-9-623, a debtor may redeem collateral by tendering amounts owed under the contract documents, excluding sums due only because of acceleration of the account, together with interest, expenses and reasonable attorneys' fees. On February 24, 2005, Royer tendered into the registry of the Court $83,439.38 as the full amount required to effect redemption. This sum consists of: $47,054 owed on the Deer Valley unit sold to Mr. Bliss some six months earlier; $6,480.41 balance due on another unit; $5,000 attorneys' fees; $22,769.97 accrued interest; and $2,125 for the replevin bond premium. The Court finds Royer's tender insufficient to redeem the collateral. As the Official Comment to U.C.C. § 9-623 states:

> tender of fulfillment obviously means more than a new promise to perform an existing promise. It requires payment in full of all monetary obligations then due **and performance in full of all other obligations then matured.** (emphasis added)

From the evidence presented in this case, the Court finds the evidence presented by

---

[7]The amount urged by Royer was merely a figure proposed in an attempted settlement which did not transpire. Royer rejected the settlement offer, and cannot claim benefit of it here.

Bombardier more credible, and properly supported by documentary evidence with respect to the monetary amounts due.  The Court therefore finds that in order to redeem the collateral, Royer must pay the monetary amounts due and owing, and must also cure the non-monetary defaults, as established by the evidence, and listed:

**Monetary defaults:**

| | | |
|---|---|---|
| Interest, Insurance, Late Charges: | $ | 65,232.02[8] |
| Replevin Bond Premium: | $ | 3718.75 |
| Attorneys' Fees: | $ | 40,668.05 |
| Out of Trust Amount: | $ | 82,768.41 |

**Non-Monetary defaults:**

Provide Bombardier all requested financial information.

Secure reinstatement of Royer as a corporation in good standing with the Mississippi Secretary of State.

Repair and restore to good condition all damaged collateral.

Replace all missing appliances with new, unused appliances.

Relocate to a safe, secure, approved and occupied Royer dealership location in Mississippi the collateral located in Slidell, LA as well as collateral unit 5699.

Failure to redeem the collateral within thirty days of the filing of the judgment will entitle Bombardier to judgment for the accelerated indebtedness.   Bombardier shall prepare and submit to the Court a judgment consistent herewith.   SO ORDERED,  this the 24th day of June, 2005.

/s/ *Robert H. Walker*
ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE

---

[8]This amount excludes interest charges for the abandoned claim of short payments on Unit 1800 ($1,000) and Unit 0177 ($500).